# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**LINDA SALCHERT,**

    Plaintiff,

    v.                                                                                                            Case No. 19-CV-1552-SCD

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

    Defendant.

## DECISION AND ORDER

        Linda Salchert applied for Social Security benefits in 2015, alleging that she is disabled based on various physical and mental impairments. Following a hearing, an administrative law judge (ALJ) denied benefits in 2018, finding that Salchert remained capable of working notwithstanding her impairments. Salchert now seeks judicial review of that decision, arguing that the ALJ erred in assessing her residual functional capacity (RFC) and relying upon the testimony of a vocational expert (VE) at step five in the sequential evaluation process. The Commissioner contends that the ALJ did not commit an error of law in reaching her decision and that the decision is otherwise supported by substantial evidence. Because Salchert has not demonstrated that the ALJ erred in formulating her RFC, any error at step five is harmless, as the ALJ determined in the first instance that Salchert remained capable of performing her past jobs as a marketing communications representative and an office manager. Accordingly, the Commissioner's decision will be affirmed.

## BACKGROUND

Salchert was born on August 4, 1969. R. 424.[1] After graduating high school, she attended the University of Wisconsin-Stout, earning a degree in business administration in 1992. R. 424–25, 929. From 1992 until 2001, Salchert worked as a marketing administrator for a cable company. R. 425–26, 707. She also sold Avon products out of her home and later worked for a few years as a marketing representative at a telephone co-op. R. 426–30, 707. In 2006, Salchert got a new job as an office manager for a process-serving company. R. 431–34, 707. While performing that job, Salchert began having constant leg pain and feeling extremely fatigued. R. 435–36. She also experienced dizziness, had pain in her wrists and hands, and experienced difficulty handling stress. R. 436–37. Salchert quit the office manager job in February 2014 because her employer stopped paying her; she hasn't worked since then. R. 434, 706.

In March 2015, Salchert applied for disability insurance benefits from the Social Security Administration (SSA), alleging that she became disabled on September 1, 2014, when she was forty-five years old. R. 630–36. Salchert asserted that she was unable to work due to fibromyalgia, benign paroxysmal positional vertigo, depression, and chronic fatigue. R. 706. In addition to pain and exhaustion, she reported problems remembering, completing tasks, concentrating, and understanding. R. 717, 719. In May 2015, Salchert underwent a psychological consultative examination by Robert J. Schedgick, PhD. *See* R. 926–39. After administering a series of psychological tests, Dr. Schedgick concluded that Salchert could understand, remember, and carry out simple and complex instructions; adequately interact

---

[1] The transcript is filed on the docket at ECF No. 9-3 to ECF No. 9-38.

with supervisors, co-workers, and peers; and adequately focus and concentrate for at least two hours, maybe even longer. R. 938.

Salchert's application was denied first at the state-agency level by the Wisconsin Disability Determination Bureau. *See* R. 482–506. Ellen Rozenfeld, PsyD, evaluated Salchert's mental impairments at the initial level of review. *See* R. 487–88. Based on her review of the record, Dr. Rozenfeld determined that Salchert suffered from a non-severe affective disorder. *Id.* As for the "paragraph B criteria," Dr. Rozenfeld concluded that Salchert had a mild restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. R. 487. Thus, according to Dr. Rozenfeld, Salchert did not have any functional limitations resulting from her mental impairments. *See id.* Pat Chan, MD, evaluated Salchert's physical impairments. *See* R. 489–93. Dr. Chan determined that Salchert was capable of skilled, light exertional work, provided she avoided concentrated exposure to hazards like machinery or heights. R. 490–91.

Salchert did not allege any changes in her conditions or any new conditions in her request for reconsideration. R. 726–27. At the reconsideration level, her mental impairments were evaluated by Lisa Fitzpatrick, PsyD, and her physical impairments were evaluated by Ronald Shaw, MD. *See* R. 500–05. The findings of Dr. Fitzpatrick and Dr. Shaw mirrored the findings of the initial state-agency consultants save for one thing: Dr. Shaw concluded that the environmental limitations opined by Dr. Chan no longer applied, as Salchert's vertigo had resolved. *See id.*

After her application was denied at the state-agency level, Salchert requested an administrative hearing before an ALJ. R. 516–17. In a pre-hearing brief, Salchert reserved her

3

right to object to the substance of the VE's hearing testimony. R. 826. Salchert, along with her attorney, appeared via video before ALJ Mattie Harvin-Woode on August 15, 2018. R. 418–81. At the time of the hearing, Salchert was living with her husband and their two daughters, ages twenty-one and eighteen. R. 455.

Salchert testified that her impairments cause constant, daily pain and chronic fatigue and that her medications cause her to feel "very fuzzy" and "a little loopy." R. 437, 440–48. She also reported that "every once in a while" her fingers and hands "get really stiff" and she gets "some tremors in [her] hands." R. 450. Because of these issues, she can type and write "only for so long" and "it's more difficult to do buttons." R. 452, 454. As for her mental-health symptoms, Salchert testified that she feels depressed every day, she has difficulties concentrating (in her words, "the fibro fog"), she's irritable, she has "really bad" anxiety, she needs reminders for medical appointments and to take her medications, she's easily distracted, and she "would have a very hard time keeping up or being in a fast-paced environment." R. 448–53.

Deborah Determan, an impartial VE, testified at the hearing as well. *See* R. 463–79. She was first questioned by the ALJ. Determan testified that Salchert had two past relevant jobs: marketing communications rep (semi-skilled, performed at the sedentary exertional level) and office manager (skilled, sedentary). R. 463–64. According to Determan, a hypothetical person with Salchert's age, education, and work experience could still perform her past jobs if she were limited to a restricted range of light work. R. 464–65. That person could also perform other unskilled, light jobs, including, for example, information clerk (DOT code 237.367-018), photocopy machine operator (DOT code 207.685-014), and toll collector (DOT code 211.462-038). R. 465. Determan estimated that there were approximately 70,000

4

information clerk jobs; 10,000 photocopy machine operator jobs; and 190,000 toll collector jobs in the national economy. *Id.*

Determan was then questioned by Salchert's attorney. Counsel first asked Determan how her testimony would change if additional restrictions were added to the hypothetical. Determan indicated that the hypothetical person could not perform her past relevant work if she were limited to occasional handling and fingering or to unskilled work. R. 469. According to Determan, a limitation to occasional handling and fingering would also eliminate the other unskilled, light jobs she provided. R. 470.

Next, counsel questioned Determan about her job-number estimates. When asked if these job-number estimates were specific to the DOT code provided or representative of other jobs, Determan replied,

> Well, the number is an estimate of the *Department of Labor* and other entities that collect information. They collect it and categorize it by *SOC* codes and each *SOC* code typically has several *DOT* codes under it. So . . . the number is the total for all of the occupations or all of the *DOT* codes that are listed under that *SOC* code. So the numbers that I provided are estimates.

R. 475–76. As for the source of this data, Determan explained,

> I utilize a computer program entitled *OccuBrowse* and what that does is compile the Government information. They use Government publications that are produced by the *Bureau of Labor Statistics* and that's compiled through surveys conducted by the *Census Bureau* and the *Bureau of Labor Statistics*. Oh, the statistical data is gathered based on the *SOC,* which is the standard occupational classification.

R. 476. Determan indicated that *OccuBrowse* does not break out the SOC estimate by DOT code. R. 476. Counsel then asked Determan how she determined the number of jobs for the specific DOT codes she provided. R. 476–77. Determan responded, "Well, as I indicated it is an estimate. I look at the number of *DOT* codes and the total number of the positions listed under the *SOC.* I divide that by the number of *DOT* codes under the *SOC.*" R. 477. Counsel

5

followed up this answer by asking Determan for the SOC codes for the jobs she cited. *Id.* The ALJ interjected, saying "the *SOC* codes are not relevant here." *Id.* Counsel objected, arguing that the ALJ was preventing him from questioning the witness. Counsel then moved on, asking Determan if there was a scientific or statistical basis for her methodology. R. 478. Determan largely repeated her previous answer: "Well, if we take the total number and divided it—the total *SOC* and divide it by the number of *DOT* codes we're getting an average for each *DOT* code and, as I indicated previously, the numbers that I provide or that can be provided are estimates." *Id.* Counsel objected again, arguing that Determan's process was not a reliable method for estimating jobs. *Id.*

> The ALJ then took over the examination, and the following exchange took place:
>
> Q Ms. Determan, the method that you just discussed and described to us, is that a method that's typically used in a vocational community for providing and determining the number of jobs in the national economy for specific positions?
>
> A Yes, it is.
>
> Q Okay, and did you rely upon not only this method, but the underlying data that you discussed, the *DOL*, from *OccuBrowse,* the *Census Bureau* and the *ELS,* that data that's gathered from the Government?
>
> A Yes, and —
>
> Q And that, in your opinion, is that a reliable source and is that a reliable method as you described in coming up with these *DOT* numbers?
>
> A I think it's a reliable source. The *DOT* and [INAUDIBLE] are other methods, but we can only work with the data that we have from the Government.
>
> Q But do you find the method reliable in providing information across the base [PHONETIC] as an answer [PHONETIC].
>
> A Yes, I do.

R. 478–79. No further questions were asked of Determan. *See* R. 479.

Applying the standard five-step process, *see* 20 C.F.R. § 404.1520(a)(4), on September 25, 2018, the ALJ issued a written decision concluding that Salchert was not disabled. *See* R. 76–98. The ALJ determined that Salchert had not engaged in substantial gainful activity during the period from her alleged onset date (September 1, 2014) through her date last insured (December 31, 2017). R. 81. The ALJ found that Salchert's severe impairments—right plantar fasciitis, fibromyalgia, right wrist injury, vertigo, and myalgia/myositis—limited her ability to work but didn't meet or equal the severity of a presumptively disabling impairment. R. 82–84. According to the ALJ, Salchert's mental impairments (depression and anxiety) did not cause more than a minimal limitation in her ability to perform basic mental work activities; thus, they were non-severe. *Id.* In making this finding, the ALJ gave "great weight" to the opinions of the state-agency consultants, Dr. Schedgick, Dr. Rozenfeld, and Dr. Fitzpatrick, and "little weight" to the opinions of Salchert's treating provider, Kristen Henke, PhD, and psychotherapist, Ashlee Rahmlow, LCSW. R. 83.

The ALJ next determined that Salchert had the residual functional capacity (RFC) to perform light work with the following additional limitations and allowances:

- She can frequently kneel, stoop, crouch, crawl, and climb ramps or stairs;
- She must avoid concentrated exposure to work hazards, such as heights and large, moving machinery; and
- She must have the option to sit every forty-five minutes for one to two minutes to alleviate discomfort.

R. 84. In assessing her RFC, the ALJ did not fully credit Salchert's allegations about the severity of her impairments. R. 84–87. As for the medical opinion evidence, the ALJ gave "some weight" to the opinions of Dr. Chan and Dr. Shaw, the reviewing state-agency physicians; "some weight" to the opinions of Mossadiq Jaffri, MD, a treating provider; "little

7

Case 1:19-cv-01552-SCD   Filed 09/21/20   Page 7 of 17   Document 23

weight" to the opinions of Elzbieta Perry, MD, Salchert's rheumatologist; and "no weight" to the opinions of Sara Kolell, a treating nurse practitioner. R. 87–88. The ALJ determined that, in light of the above RFC, Salchert could perform her past jobs as a marketing communications representative and an office manager; therefore, she was not disabled. R. 88–90. As an alternative finding, the ALJ determined that, based on the VE's testimony, there were other jobs that existed in significant numbers in the national economy that Salchert could have performed, including an information clerk, a photocopy machine operator, and a toll collector. R. 89–90. In making this alternative step-five finding, the ALJ overruled counsel's objections, concluding that the VE's job information was reliable. R. 90.

After the SSA's Appeals Council denied review, *see* R. 1–7, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016), Salchert filed this action on October 24, 2019, *see* ECF No. 1. The matter was reassigned to me in April 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 12, 17. The matter is fully briefed and ready for disposition. *See* ECF Nos. 10, 21, 22.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive

if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and

9

the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Salchert contends the ALJ erred in (1) failing to sufficiently explain why limitations in handling or fingering were not included in the RFC assessment; (2) failing to accommodate her non-severe mental impairments; and (3) relying on the VE's job-number testimony.

### I. Handling and Fingering Limitations

Salchert first argues that the ALJ did not sufficiently address her handling and fingering limitations. She acknowledges the ALJ mentioned her allegations of fatigue and hand pain but asserts that the ALJ's only reasons for discounting these allegations—normal range of motion and a lack of synovitis—were deficient because such findings do not involve fibromyalgia. Salchert also points to the fibromyalgia questionnaire completed by Dr. Perry, her rheumatologist, wherein Dr. Perry opined that Salchert could handle and finger only occasionally, as well as other medical records she claims corroborate her hand complaints. The ALJ's failure to address Salchert's handling and fingering limitations was material, according to Salchert, as the VE testified that a hypothetical person in Salchert's position would not be able to perform her past work or the other light-work jobs identified by the VE if she were limited to occasional handling and fingering. *See* ECF No. 10 at 16–19.[2]

---

[2] All citations to Salchert's briefs reflect the pagination provided by CM/ECF.

Between steps three and four of the sequential evaluation process, the ALJ must determine the claimant's RFC—that is, the most she can do despite her physical and mental limitations. 20 C.F.R. § 404.1545(a)(1); *see also* Social Security Ruling (SSR) 96-8p, 1996 SSR LEXIS 5, at *2 (July 2, 1996). ALJs must assess a claimant's RFC "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements.'—i.e., opinions about what the individual can still do despite his or her impairments." SSR No. 96-8p, 1996 SSR LEXIS 5, at *5–6. "The RFC assessment must address both the remaining exertional and nonexertional capacities of the individual." *Id.* at *15. "Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." *Id.* "Nonexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength . . . . It assesses an individual's abilities to perform physical activities such as postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision)." *Id.* at *16. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *19.

The ALJ here did not err in assessing Salchert's nonexertional capacity to handle and finger. As Salchert concedes, the ALJ discussed her general allegations of pain and fatigue, as well as her specific complaint of hand pain and her alleged inability to type for too long. *See* R. 85. The ALJ, however, determined that Salchert's allegations were not consistent with or

11

supported by the record. *See* R. 85–88. In reaching this finding, the ALJ discussed in detail the objective medical evidence, which showed normal upper-extremity strength; normal sensation; normal range of motion in her shoulders, arms, wrists, and hands; normal muscle tone; no synovitis (i.e., inflammation in the soft tissue that lines the joints) in her hands; and wrists, elbows, and shoulders without effusions (i.e., fluid around the joints). *See* R. 85 (citing Ex. 2F/12–13 [R. 860–61]); R. 85–86 (citing Ex. 1F/10 [R. 845]); R. 86 (citing Ex. 11F/22 [R. 1421], Ex. 7F/7 [R. 981], Ex. 19F/60 [R. 1887], Ex. 7F/134 [R. 1108]). The ALJ also noted times when Salchert reported improvement in her symptoms. *See* R. 86 (citing Ex. 2F/40 [R. 888], Ex. 2F/54 [R. 902], Ex. 19F/4 [R. 1831]). And the ALJ explained that, in her function reports, Salchert indicated that she had no trouble with personal care activities and that she could do her laundry and wash dishes—that is, activities at odds with her alleged limitations handling and fingering. *See* R. 87 (citing Ex. 3E/2–3 [R. 713–14]).

Salchert attempts to downplay this objective medical evidence, arguing that none of it contradicts her complaints of hand pain. I disagree. The ALJ did not, as Salchert suggests, reject her complaints of disabling pain from fibromyalgia based solely on her demonstrating full range of motion and no synovitis upon examination. Rather, the ALJ cited medical facts and nonmedical evidence that contradicted the severity of the specific functional limitations she claimed concerning her hands and fingers.

But the ALJ did not stop at the objective medical evidence and Salchert's reported activities. Dr. Chan and Dr. Shaw, the state-agency physicians, both determined that Salchert was capable of light work without *any* postural or manipulative limitations. *See* R. 489–91, 503–04. The ALJ assigned some weight to these opinions, explaining that they were generally consistent with the record. R. 87. However, the ALJ determined that Salchert's physical

12

impairments required further postural limitations not assessed by Dr. Chan or Dr. Shaw. The ALJ also relied in part on the opinion of Dr. Jaffri, one of Salchert's treating providers. *See* R. 87. In February 2018, Dr. Jaffri completed a medical source statement in which he indicated that Salchert could sit for at least six hours in an eight-hour workday, stand/walk for at least six hours, frequently lift ten pounds, and occasionally lift fifty pounds. *See* R. 1500–01. Dr. Jafri further indicated that Salchert did not have any limitations in the use of her hands or upper limbs. *See* R. 1501–02. Although the ALJ didn't think Salchert could lift fifty pounds and believed that the record supported additional postural limitations not reported by Dr. Jafri, the ALJ adopted the rest of his opined limitations. R. 85. Thus, the ALJ's RFC assessment was more restrictive than the opinions of the reviewing state-agency physicians and Salchert's own doctor. Salchert does not take issue with the ALJ's evaluation of these doctors' opinions.

Instead, Salchert focuses on Dr. Perry, who opined in May 2018—more than four months after the date last insured—that Salchert could use her hands and fingers, respectively, for only thirty percent of an eight-hour workday (among other limitations). R. 1803. The ALJ assigned little weight to Dr. Perry's opinion, finding it "not consistent with the evidence of record." R. 87. The ALJ explained that, despite pain and dizziness, Salchert "generally had normal coordination, posture, extremity strength, sensation, and gait." *Id.* (citing Ex. 1F/10 [R. 845], Ex. 2F/12–13 [R. 860–61], Ex. 7F/7 [R. 981], Ex. 11F/22 [R. 1421], Ex. 19F/60 [R. 1887]). The ALJ further noted that, in 2016, Salchert "reported that she was back to her regular activities, without vertigo symptoms." R. 87 (citing Ex. 11F/24 [R. 1423]). Salchert does not explicitly challenge the weight afforded to Dr. Perry's opinions; in any event, the ALJ provided "good reasons" to discount them. *See* 20 C.F.R. § 404.1527(c).

13

Salchert does cite to medical records that purportedly corroborate her claimed handling and fingering limitations. *See* ECF No. 10 at 18. These records, however, are merely her subjective reports to doctors, *see* R. 842, 1030, 1034, 1854, which the ALJ reasonably discounted. Moreover, the records largely concern Salchert's general fibromyalgia symptoms and reported flare-ups. Salchert does not explain how the records that do mention issues with her hands and fingers, R. 1034 (rating her pain level as 5, "mainly in her fingers and left heel"), 1854 ("She also recently noticed more stiffness in her hand joints. She has difficulty typing on the keyboard."), demonstrate that she can engage in such activities only occasionally.

Because Salchert's claimed limitations handling and fingering were not supported by the objective medical evidence, Salchert's reported activities, or the medical opinion evidence in the record, the ALJ reasonably did not include any such limitations in the RFC assessment.

## II. Mental-Health Limitations

Next, Salchert argues that the ALJ failed to include any mental-health limitations in the RFC assessment. *See* ECF No. 10 at 19–22. At step two, the ALJ determined that Salchert's depression and anxiety "did not cause more than minimal limitation in [her] ability to perform basic mental work activities." *See* R. 82–84. Salchert does not challenge this finding. In fact, she concedes that "the record does not establish significant limitations." ECF No. 10 at 22. She nevertheless faults the ALJ for not addressing her non-severe mental impairments in the RFC assessment.

It's true that, "[i]n assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, *even those that are not 'severe.'*" SSR 96-8p, 1996 SSR LEXIS 5, at *14. But Salchert has not identified any mental-health limitations that the ALJ omitted and should have included in the hypothetical question and RFC. *See Jozefyk v.*

14

*Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (ruling any error in RFC harmless in part because plaintiff hypothesized no additional restrictions). She points out that the ALJ determined at step two that she had "mild" limitations in the activities of daily living and in concentration, persistence, or pace, *see* R. 83–84, but she doesn't explain how these findings—which the ALJ explicitly noted did not constitute an RFC assessment, R. 84—translated into any functional limitations. Likewise, Salchert merely speculates that limiting her to a lower level of skill work may have precluded her past relevant work.

Notwithstanding the deficiencies of Salchert's argument, it was reasonable for the ALJ not to include any mental-health limitations in the RFC assessment. At step two, the ALJ discussed Salchert's relatively unremarkable mental-status examinations. *See* 82–83. While at times Salchert presented as tearful, distressed, anxious, and distractible, she consistently exhibited normal fund of knowledge, attention, concentration, language, and memory; normal appearance; good eye contact; normal speech; normal orientation; above average intellectual functioning; unremarkable thought content; appropriate insight; and intact judgment and thought process. *See, e.g.*, R. 845, 981, 1271, 1277–79, 1282–84, 1288, 1831. The ALJ further noted that Salchert "was discharged from counseling in May of 2017 because she failed to keep appointments" and that "her provider noted that [her] condition was somewhat improved." R. 82–83.

The ALJ also relied on the opinions of the state-agency psychologists. Dr. Schedgick performed a consultative psychological examination in May 2015. *See* R. 926–40. He reviewed some medical records, interviewed Salchert, and administered a mental-status exam. Ultimately, Dr. Schedgick concluded that Salchert could understand, remember, and carry out simple and complex instructions; adequately interact with supervisors, co-workers, and

15

peers; and adequately focus and concentrate for at least two hours. R. 938. Likewise, the reviewing state-agency psychologists, Dr. Rozenfeld and Dr. Fitzpatrick, determined that Salchert's mental impairments were non-severe; they did not assess *any* functional limitations. *See* R. 487–88, 500–01. The ALJ assigned these three opinions great weight, finding them consistent with Dr. Schedgick's objective testing and Salchert's unremarkable mental-status exams. *See* R. 83. Salchert does not challenge the ALJ's evaluation of these opinions.

The best evidence in support of Salchert's claimed mental-health limitations comes from her treating psychotherapists, Dr. Henke and Ms. Rahmlow. Both therapists opined that Salchert had marked limitations in mental functioning; Dr. Henke further opined that Salchert was incapable of even low-stress jobs. *See* R. 1510–19, 1821–27.[3] The ALJ assigned little weight to these opinions, finding them unsupported by the objective findings during the consultative exam and other mental-status exams. *See* R. 83 (citing Ex. 3F/4–6, 8, 10 [R. 929–31, 933, 935], Ex. 7F/7 [R. 981], Ex. 9F/4, 10–12, 15–17, 21 [R. 1271, 1277–79, 1282–84, 1288], Ex. 19F/4 [R. 1831]). Again, Salchert does not challenge the ALJ's evaluation of these medical opinions; in any event, the ALJ provided "good reasons" to discount them. *See* 20 C.F.R. § 404.1527(c).

Because the medical record did not support any functional limitations stemming from Salchert's non-severe mental impairments, the ALJ reasonably did not include any in the RFC assessment.

---

[3] Ms. Rahmlow also noted that she couldn't answer several questions because they were outside her area of expertis. R. 1821, 1823.

### III. Reliability of the VE's Job-Number Estimates

Finally, Salchert argues that the ALJ's step-five finding lacks adequate foundation because the ALJ failed to ensure that the VE's methodology for producing her job-number estimates was reliable, the ALJ denied Salchert the ability to cross-examine the VE about her job-number estimates, and the ALJ failed to sufficiently resolve Salchert's objection to the VE's testimony. *See* ECF No. 10 at 22–30. The ALJ, however, did not rely on this portion of the VE's testimony when she determined that Salchert remained capable of performing her past relevant work. In other words, Salchert's claim was denied at step four, not step five; indeed, the ALJ explicitly stated that her step-five finding was "[i]n the alternative," meaning it wasn't necessary to the ultimate outcome. *See* R. 88–91. And Salchert has not demonstrated that the ALJ erred at step four. Thus, even if the ALJ's step-five finding is unsound, any error in reaching that finding is harmless.

## CONCLUSION

For all the foregoing reasons, I find that Salchert has not demonstrated that the ALJ committed reversible error in formulating her RFC. Thus, the Commissioner's decision is **AFFIRMED**. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 21st day of September, 2020.

_____
STEPHEN C. DRIES
United States Magistrate Judge